An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1008
NORTH CAROLINA COURT OF APPEALS

Filed: 1 April 2014


NORTH CAROLINA DEPARTMENT OF
CORRECTION,
    Petitioner
    (Respondent below),

    v.                                      Wake County
                                          No. 12 CVS 002136
VIVIAN PARKER,
    Respondent
    (Petitioner below).


Appeal by respondent from order entered 14 May 2013 by Judge Howard E. Manning, Jr. in Wake County Superior Court. Heard in the Court of Appeals 23 January 2014.


    *Attorney General Roy Cooper, by Assistant Attorney General Yvonne B. Ricci, for petitioner-appellee.*

    *Monteith & Rice, PLLC, by Charles E. Monteith, Jr. and Shelli Henderson Rice, for respondent-appellant.*


    HUNTER, JR., Robert N., Judge.


Vivian Parker ("Respondent" or "Parker") appeals from the 14 May 2013 order upholding the State's dismissal of her from employment with the North Carolina Department of Correction ("DOC"). Respondent argues that DOC did not have just cause to

dismiss her from employment. We disagree and affirm the order of the superior court.

## I. Facts & Procedural History

On 28 October 2010, Parker filed a Petition for a Contested Hearing with the Office of Administrative Hearings ("OAH") alleging that DOC wrongfully discharged her without cause. The OAH held a hearing on 8 June 2011. Evidence presented at that hearing tended to show the following.

Parker began working for DOC in October 2000 as a correctional officer at Pender Correctional Institution. Parker was promoted to correctional sergeant after two years and was promoted again in September 2008 to correctional lieutenant, the position she held at the time of her dismissal.

On 27 April 2010, Parker lived at 724 Ivey Street in Wallace. Her adult son, Brandon Huffin ("Brandon"), was on probation, and his address of record was Parker's home at 724 Ivey Street.

Michael Moready ("Officer Moready"), a surveillance officer for DOC, received complaints about drug activity in the area and on 27 April 2010, he went to 724 Ivey Street to conduct a warrantless search of what he believed to be Brandon's residence. When Officer Moready arrived at the house, Brandon

was in the yard. When Brandon asserted that 724 Ivey Street was not his residence, Officer Moready called back to his office to verify that 724 Ivey Street was listed as Brandon's residence of record, which it was. Michael Glen Tyndall ("Detective Tyndall"), a detective for the Duplin County Sheriff's Office, arrived at the scene as Officer Moready was talking with Brandon.

When Brandon refused to let officers into the house, Officer Moready let him know he would be arrested and handcuffed him. Parker then came out of the house, where Officer Moready explained his presence. Parker told Officer Moready that the house was not Brandon's residence. Officers described Parker as confrontational and uncooperative in denying that the house was Brandon's residence.

After Officer Moready explained to Parker that 724 Ivey Street was Brandon's address of record and that the probation office had not been notified of any change in residence, Parker said that Brandon did live at her house "sporadically." Parker then agreed to let officers come into the living room area, where she said Brandon slept when he was at the house.

Jason Douglas Debose ("Detective Debose"), a detective for the Duplin County Sheriff's Office, went into the house with

Parker and Detective Tyndall.  Parker pointed out the couch where Brandon slept when he stayed there.  While inside the house, Detective Tyndall smelled marijuana, although Detective Debose said he could not smell it.  After Detective Tyndall stated that he smelled marijuana, Parker told them to stop the search and said that they "would have to get a warrant if [they] wanted to continue."

While they waited for the warrant, Parker asked to go back into the house.  Detectives Debose and Tyndall had to tell Parker several times that she could not go back into the house, and she was "very, very adamant about going into the house."

Tommy Huffin ("Tommy"), Parker's brother, showed up in the yard at the house and took photos of officers with his cell phone.  Tommy pointed the phone at Detective Debose's face, and Detective Debose took the phone from him.  Tommy insisted that Detective Debose give his phone back.  When Parker saw the confrontation, she told Tommy to "shut up."  Tommy reached toward his waistline, and Detective Debose pulled his gun.  Detective Tyndall then handcuffed Tommy.  Detective Tyndall ordered everyone at the scene, including Parker, to be placed in handcuffs for safety reasons.

After obtaining the warrant, officers searched the house and found marijuana and drug paraphernalia in a bedroom along with documentation such as release orders, a bank card, and clothes in a rear bedroom. Based on this evidence officers concluded that Brandon stayed there. In Parker's room, officers found a stolen revolver between the mattresses. In the backyard, officers found a pound of marijuana beside a storage shed.

Parker was charged with resisting arrest, possession of marijuana, possession of a stolen firearm, and maintaining a dwelling for controlled substances. She pled no contest to maintaining a dwelling on 13 April 2011, and the other charges were dismissed.

Parker notified her superior at DOC of her charges the same day she was arrested. Ricky Reagan Rivenbark ("Mr. Rivenbark"), Assistant Superintendent of Custody and Operations for Pender Correctional assigned Robert Lynn Norville ("Captain Norville"), Correctional Captain in charge of Special Operations at Pender Correctional, to conduct the investigation into Parker's conduct. After investigation, Captain Norville concluded that Parker "was belligerent when they were trying to do a search warrant with her son at that residence. [Her actions] were

unbecoming of a state employee which . . . led to us feeling it was unacceptable personal conduct."

Mr. Rivenbark recommended to the Superintendent that Parker be dismissed for "actions and behavior . . . unbecoming of a state employee and . . . detrimental to state service." Specifically, Mr. Rivenbark noted that Parker was uncooperative and belligerent with law enforcement officers. At the OAH hearing, Mr. Rivenbark testified that although the criminal charges against Parker were not the reason for his recommendation, they did cause him to lose trust in her. DOC dismissed Parker on 25 June 2010.

At the OAH hearing, Parker testified on her own behalf and presented the testimony of her husband, Bobby Gene Parker ("Bobby"), and her mother, Vianne Pigford Newkirk ("Newkirk"). Parker testified that Brandon was not living with her on 27 April 2010. When asked about Brandon's mail and clothing that were found in a bedroom, Parker testified that there was clothing and mail in the house from many of her children who did not live there because "[i]t's a family house, and . . . they come there . . . and leave something and then leave." Newkirk testified that on that date, Brandon was living with her at 726 Bray Street.

Parker testified that she never revoked her consent to search the house and that she never told the officers that they would need a warrant to continue. She said that she asked to go back into the house in order to get her clothes to go to work.

Parker testified that she did not know about the guns or marijuana in the house. She testified that she pled no contest to maintaining a dwelling because she was advised that she could be found guilty of the charge even if she did not know the marijuana was on her property.

Bobby, who was not living with Parker at the time and did not arrive on 27 April 2010 until after everyone had been handcuffed, testified that he also had no knowledge of the guns or marijuana in the house. Newkirk testified that the stolen revolver had been her husband's gun and that she had put it between Parker's mattresses without Parker's knowledge.

On 26 September 2011, Administrative Law Judge Joe L. Webster filed a decision finding that DOC had not carried its burden of proof that Parker's conduct was "just cause" for termination and that even if it was "just cause," DOC should not have terminated Parker, but should have disciplined her in other ways, recommending a 30-day suspension and training for Parker. In his decision, Judge Webster found the following fact: "40. On

April 13, 2011, [Parker] pled no contest [to] misdemeanor maintain[ing a] vehicle/dwelling/place for controlled substance[s]." On 13 January 2012, the State Personnel Commission adopted Judge Webster's decision.

On 13 February 2012, DOC filed a petition for judicial review with the Wake County Superior Court. On 14 May 2013, the Wake County Superior Court, Judge Howard E. Manning, Jr. presiding, issued its order reversing the decision of the State Personnel Commission and upholding Parker's dismissal. The court found that "applying the whole record test, . . . Finding of Fact No. 40 . . . in the Decision and Order of the State Personnel Commission, was supported by the substantial evidence of record and was not arbitrary or capricious." The court went on to state that

> it is undisputed that [Parker] pled no contest to misdemeanor maintain[ing a] vehicle/dwelling/place for controlled substance[s]. However, because of Ms. Parker's position as a Lieutenant for the NCDOC there is a clear nexus between the drug related offense to which she undisputedly plead no contest and her position of trust and authority as a correctional lieutenant. Further, Parker's no contest plea to this drug related offense is sufficient to justify her dismissal for unacceptable personal conduct and is supported by the substantial evidence of record and just cause.

Parker filed timely notice of appeal on 13 June 2013.

## II. Jurisdiction & Standard of Review

Respondent's appeal from the superior court's final judgment lies of right to this Court. N.C. Gen. Stat. § 7A-27(b) (2013).

"When reviewing a superior court order concerning an agency decision, we examine the order for errors of law." *Warren v. N.C. Dep't of Crime Control & Pub. Safety*, ___ N.C. App. ___, ___, 726 S.E.2d 920, 922 (2012). "The process has been described as a twofold task: (1) determining whether the trial court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly." *Amanini v. N.C. Dep't of Human Res.*, 114 N.C. App. 668, 675, 443 S.E.2d 114, 118–19 (1994). We review whether conduct constituted just cause for dismissal *de novo*. *Warren*, ___ N.C. App. at ___, 726 S.E.2d at 923.

The superior court may reverse or modify the decision of an agency if

> the findings, inferences, conclusions, or decisions are:
> (1) In violation of constitutional provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
> (3) Made upon unlawful procedure;

(4) Affected by other error of law;
(5) Unsupported by substantial evidence . . . in view of the entire record as submitted; or
(6) Arbitrary, capricious, or an abuse of discretion.

N.C. Gen. Stat. § 150B-51(b) (2013). For subdivisions (1) through (4), the court uses a *de novo* standard of review. N.C. Gen. Stat. § 150B-51(c). For subdivisions (5) and (6), the court uses a whole record standard. *Id.*

In the present case, the superior court applied the whole record test in finding that Finding of Fact No. 40 from the State Personnel Commission decision was supported by substantial evidence of record and was not arbitrary or capricious. *See* N.C. Gen. Stat. §§ 150B-51(b)(5), (6). It then applied *de novo* review in reviewing the errors of law. *See* N.C. Gen. Stat. §§ 150B-51(b)(1)-(4). As the superior court used the appropriate standards, we will focus our analysis on the question of whether it applied those standards properly. *See* N.C. Gen. Stat. § 150B-51(c); *Amanini*, 114 N.C. App. at 675, 443 S.E.2d at 118-19.

### III. Analysis

Parker argues that the superior court erred in concluding that DOC had just cause to dismiss her from employment. We disagree.

No career State employee subject to the N.C. State Human Resources Act may be dismissed from employment unless it is with just cause. N.C. Gen. Stat. § 126-35(a) (2013). It is undisputed that Parker was a career State employee who could not be dismissed without just cause. "Unacceptable personal conduct" is a basis for dismissal under the just cause standard. 25 N.C. Admin. Code 1J.0604 (2012).

There are three questions in determining whether a State agency had just cause to discipline an employee: "(1) whether the employee engaged in the conduct the employer alleges; (2) whether the employee's conduct falls within one of the categories of unacceptable personal conduct provided by the North Carolina Administrative Code; and (3) whether that unacceptable personal conduct amounted to just cause for the disciplinary action taken." *Bulloch v. N.C. Dep't of Crime Control & Pub. Safety*, ___ N.C. App. ___, ___, 732 S.E.2d 373, 377 (2012) (citing *Warren*, ___ N.C. App. at ___, 726 S.E.2d at 925).

The first question is whether Parker engaged in the conduct alleged. The superior court on review found that Finding of Fact No. 40 of the State Personnel Commission's decision was supported by substantial evidence and was not arbitrary or

capricious. That finding stated, "On April 13, 2011, [Parker] pled no contest [to] misdemeanor maintain[ing a] vehicle/dwelling/place for controlled substance[s]." Parker admitted in the hearing that she had pled no contest to maintaining a dwelling, and a certified copy of the disposition of that charge was introduced. *See* N.C. Gen. Stat. § 15A-1022(c) (2013) (requiring a factual basis for a no contest plea). At the hearing, officers testified that both drug paraphernalia and marijuana were found in and around Parker's home. These facts are sufficient to show that Parker engaged in maintaining a dwelling for controlled substances.

The next question is whether Parker's maintenance of a dwelling for controlled substances constitutes "unacceptable personal conduct." As defined by the N.C. Administrative Code, "unacceptable personal conduct" includes

> (a) conduct for which no reasonable person should expect to receive prior warning;
>
> (b) job-related conduct which constitutes a violation of state or federal law;
>
> (c) conviction of a felony or an offense involving moral turpitude that is detrimental to or impacts the employee's service to the State;
>
> (d) the willful violation of known or written work rules;

(e) conduct unbecoming a state employee that is detrimental to state service;

(f) the abuse of client(s), patient(s), student(s) or a person(s) over whom the employee has charge or to whom the employee has a responsibility or an animal owned by the State;

(g) absence from work after all authorized leave credits and benefits have been exhausted; or

(h) falsification of a state application or in other employment documentation.

25 N.C. Admin. Code 1J.0614 (2012).

The DOC Personnel Manual lists examples of unacceptable personal conduct, including "[a]ctions which could result in a conviction of a felony, misdemeanor, or alcohol/drug related offense including DWI," "[f]ailure to cooperate with Federal, State, Local, or Departmental officials or hindering internal/external investigations," and "[v]iolations of law." The Alcohol/Drug-Free Work Place Policy as laid out in the Personnel Manual states the following:

Possession of an illegal substance in any situation, at work or away from the work site shall be cause for discipline. Possession of controlled substances, ie. Prescription medication or alcohol, must be in compliance with existing laws. Violations will result in discipline up to and including dismissal based on personal misconduct.

> Employees who are arrested, detained, or served a warrant for any alcohol/drug related incident, at the work site or away from the work site have 24 hours to file a written report of the situation with the work unit supervisor/manager, i.e. Warden, Superintendent, Judicial District Manager, etc. The work unit supervisor/manager shall make a recommendation for appropriate disciplinary action based on the facts of the case after conducting a thorough investigation.

Since Parker's actions did result in a conviction of a drug-related misdemeanor, it is clear that her actions constituted "unacceptable personal conduct" under DOC rules and the Administrative Code. We now turn to the third question of whether Parker's actions provided just cause for dismissal.

"[W]here an employee has engaged in off-duty criminal conduct, the agency need not show actual harm to its interests to demonstrate just cause for an employee's dismissal." *Eury v. N.C. Emp't Sec. Comm'n*, 115 N.C. App. 590, 611, 446 S.E.2d 383, 395 (1994). Rather, "the agency must demonstrate that the dismissal is supported by the existence of a *rational nexus* between the type of criminal conduct committed and the potential adverse impact on the employee's future ability to perform for the agency." *Id.* at 611, 446 S.E.2d at 395–96. Factors considered in determining whether a rational nexus exists are:

> [1] the degree to which, if any, the conduct

may have adversely affected clients or colleagues;

[2] the relationship between the type of work performed by the employee for the agency and the type of criminal conduct committed;

[3] the likelihood of recurrence of the questioned conduct and the degree to which the conduct may affect work performance, work quality, and the agency's good will and interests;

[4] the proximity or remoteness in time of the conduct to the commencement of the disciplinary proceedings;

[5] the extenuating or aggravating circumstances, if any, surrounding the conduct;

[6] the blameworthiness or praiseworthiness of the motives resulting in the conduct; and

[7] the presence or absence of any relevant factors in mitigation.

*Id.* at 611, 446 S.E.2d at 396.

Parker argues that DOC failed to show a rational nexus between Parker's criminal charge and her employment, particularly because Correctional Administrator Michael Bell ("Bell"), who made the decision to dismiss Parker, did not testify at the hearing.

We have found no authority for the proposition that the decision maker must testify in order to establish a rational

nexus. In the present case, the superior court held "there is a clear nexus between the drug related offense to which [Parker] undisputedly plead no contest and her position of trust and authority as a correctional lieutenant."

Mr. Rivenbark indicated in his testimony that the fact that drugs were found in Parker's home was one of the factors that caused him to lose trust in Parker. He said that DOC has a drug-free policy and that they have had a problem with staff bringing drugs into Pender Correctional. He said that they trust the lieutenants and captains to enforce the rules and search staff as they come in. Parker's employment records indicate that as a part of the drug task force team, she was involved in searching staff entering the facility.

In the letter from DOC to Parker informing her of her dismissal, Bell quoted the Drug-Free Work Place Policy and listed the criminal charges against Parker before coming to the conclusion that Parker's actions constituted unacceptable personal conduct sufficient to warrant dismissal. The letter noted that "[Parker's] actions have the potential to bring discredit to the Department." Given Parker's duties as a lieutenant, including searching staff for drugs being brought into the facility, Mr. Rivenbark's testimony and the letter from

DOC show a rational nexus between the presence of drugs at Parker's home and DOC's loss of trust in her ability to perform her job duties. This close relationship between Parker's actions and her inability to continue in employment with DOC provided just cause for her dismissal.

Although Parker argues that she was not dismissed because of the criminal charges, but based on her lack of cooperation with officers, both Mr. Rivenbark's testimony and the letter from DOC indicate that the drugs and drug paraphernalia found at Parker's house were part of the basis for her dismissal. As we agree with the superior court that this alone was just cause for dismissal, there is no need to review other allegations.

## IV. Conclusion

For the foregoing reasons, the decision of the superior court is

AFFIRMED.

Judges STROUD and DILLON concur.

Report per Rule 30(e).